BOARD OF RAILROAD COMMISSIONERS ET AL., APPELLANTS, v. GAMBLE–ROBINSON CO. ET AL., RESPONDENTS.

(No. 8,106.)

(Submitted January 27, 1941. Decided February 18, 1941.)

[111 Pac. (2d) 306.]

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. George H. Smith,* County Attorney of Yellowstone County, and *Mr. Emmet C. Angland,* Counsel for Plaintiff State Board, submitted an original and a reply brief; *Mr. John W. Bonner,* newly elected Attorney General, and *Enor K. Matson,* newly appointed counsel for Plaintiff State Board, of counsel on appeal; *Mr. Bonner* argued the cause orally.

*Messrs. Johnson, Coleman & Jameson,* for Respondents, submitted a brief; *Mr. H. J. Coleman* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is an appeal from an order denying plaintiffs' prayers for temporary injunctions after a hearing upon orders to show cause in three separate suits against Gamble-Robinson Company, Keil Company and Ryan Grocery Company which were combined by agreement of the parties. The actions are practically identical upon the pleadings, and also upon the evidence except as hereinafter stated.

The suit was brought under Chapter 310 of the Political Code of Montana (secs. 3847.1 to 3847.28, Rev. Codes), which was originally enacted as Chapter 184 of the 1931 Session Laws, for the supervision and regulation of motor carriers by the State Board of Railroad Commissioners.

Section 3847.1, subdivision (h) defines the term "motor carrier" as any person or corporation "operating motor vehicles upon any public highway in the state of Montana for the transportation of persons and/or property for hire, on a commercial basis either as a common carrier or under private contract, agreement, charter, or undertaking" with certain exceptions not material here.

Section 3847.1, subdivision (l) provides: "The words 'for hire' mean for remuneration of any kind, paid or promised, either directly or indirectly. An occasional accommodative transportation service by a person not in the transportation business shall not be construed as a service for hire, even though the person transported shares in the cost or pays for the service."

Section 3847.2 makes it unlawful for any person or corporation "to operate any motor vehicle for the transportation of persons and/or property for hire on any public highway," road or street within the state except in accordance with the Act, and divides motor carriers into three classes, the last of which it defines as follows: "Class C motor carriers shall em-

brace all motor carriers operating motor vehicles for distributing, delivering or collecting wares, merchandise, or commodities, or transporting persons, where the remuneration is fixed in and the transportation service furnished under a contract, charter, agreement or undertaking.''

Section 3847.3 empowers the Board of Railroad Commissioners to supervise and regulate all motor carriers in the state, and section 3847.10 provides that no Class C motor carrier ''shall hereafter operate for the distribution, delivery, or collection of goods, wares, merchandise, or commodities, or for the transportation of persons on any public highway in this state, without first having obtained from the board, under the provisions of this Act, a certificate that public convenience and necessity require such operation.''

Section 3847.11 provides that upon application for such a certificate notice shall be given and all interested parties heard for or against the same, and that if ''the board shall find, from the evidence, that public convenience and necessity require the authorization of the service proposed, or any part thereof as the board shall determine,'' consideration being given the present transportation facilities, the apparent permanence of the proposed service, etc., it shall issue a certificate therefor. This section also provides that an application by a Class C carrier ''may be disallowed without a public hearing thereon when it appears from the records of the board that the route or territory sought to be served by the applicant has previously been made the basis of a public investigation and finding by the board that public convenience and necessity do not require such proposed motor carrier service unless it is made to affirmatively appear in the application by a recital of the facts that conditions obtaining over said route or in said territory and affecting transportation facilities therein have materially changed since said public investigation and finding and that public convenience and necessity do now require such motor carrier operation.''

In each action plaintiffs sought an injunction restraining the defendant from operating motor vehicles upon any public high-

way, road or street in the state for the transportation of property for hire on a commercial basis, either as a common carrier or under private contract, charter, agreement or undertaking, without procuring from plaintiffs a certificate of public convenience and necessity.

The complaints originally alleged that each defendant was "transporting property belonging to third persons for hire on a commercial basis, as a common carrier or under private contract" etc., but at the trial each was amended to eliminate the reference to the property of third persons, and to allege that the defendant "is transporting property belonging to said [defendant] for hire" etc. The answers placed in issue the contention that the defendants were motor carriers within the meaning of the Act.

The evidence shows that each of the three defendants is a wholesaler or jobber selling groceries and fruits in Billings and the territory tributary thereto, that the business is highly competitive and of a close margin, and that each maintains its own trucks for the delivery of its merchandise to customers at Billings and outlying cities and towns, some of them one hundred or more miles from Billings; that each defendant's motor vehicle deliveries are purely incidental to its wholesale business and that none of them is engaged in the business of hauling property for others or is competing for such business with those engaged therein; that none of the defendants has procured or applied to the plaintiffs for a certificate of convenience and necessity.

During the months of March and April, 1939, the Billings branch of Gamble-Robinson Company had followed the system of adding a small "Sales and Service" or "S. and S." charge not constituting purely a freight or transportation charge but covering in part the expenses incidental to out of town sales, including general trucking, packing and night crew costs. About May first and before any intimation of suit the practice was discontinued by the Billings branch of Gamble-Robinson because it had proved unsatisfactory to both the defendant and its customers; but it was stipulated at the trial that the practice

"is or may be continued by Gamble-Robinson Company in or at all other branch houses in the State of Montana."

The evidence shows that since the discontinuance of the special "S. and S." charge the transportation service and other expense formerly included therein has been absorbed by the general expense of doing business; that it is not possible to add delivery charges to the bills because prices are affected by competition not only with other firms at Billings but with firms at Red Lodge, Miles City, Roundup, Bozeman and Livingston, Montana, and at Sheridan and Casper, Wyoming; that the prices do not vary with the trucking expense nor with the distance from Billings because the competition does not permit; that in some cases the prices at outside points are the same as or lower than the Billings prices; that it is impossible to add the freight charges to the specific shipments directly or indirectly, but that they must be absorbed as part of the general expense if the defendant is to remain in business.

With regard to the defendant Keil Company, the evidence shows that prior to May 1, 1939, it made specific charges on invoices, such as "plus 20¢ cwt $.33," "plus 25¢ cwt dely chge $1.98," but that about that time it eliminated such special charges; that to compete with jobbers from other cities it is necessary to quote prices for goods delivered to the purchaser and that the truck expense is and must be covered by increasing the sales price margins to the extent permitted by competition.

With reference to the Ryan Grocery Company, the evidence shows that prior to May 1, 1939, it made a delivery or handling charge which was based on tonnage but not on distance and was therefore the same for deliveries at Columbus as at Livingston, Hardin or Pompey's Pillar; that it was estimated to cover so far as possible the expense of out of town sales, including increased sales and night crew expense and also trucking and handling charges; it appeared on some of the invoices as "plus sales and service ex." That system was never possible at all points because of competitive conditions, and had been abandoned prior to suit and all expenses included in general busi-

ness expense. The prices do not directly reflect delivery costs and in some cases, due to competition from other points, are lower at outside towns than at Billings.

The deliveries of goods by each defendant have in all cases been purely incidental to its wholesale business. It seems clear from the testimony that none of the defendants ever made a specific charge for delivering the goods sold by it, but that each made charges tending to cover in some measure all the various items of additional expense occasioned by out of town sales and delivery. In no case was it shown that the charge for goods delivered in other towns was the Billings price plus transportation cost, or that the charge covered the transportation cost.

All of the defendants had discontinued making these special charges prior to suit and have expressed no intention of resuming them except as perhaps suggested by the stipulation of Gamble-Robinson Company mentioned above. What difference this makes would seem doubtful since, as we have pointed out above, none of the charges was shown to be adequate to cover transportation costs, or amounted to a direct charge for that purpose, or excluded other features than transportation. The most that can be said is that the charge represented some part of the transportation cost, and that the remainder of that cost was at all times absorbed in the general expense of doing business and was therefore paid indirectly by all of each defendant's customers. The only effect of the change prior to suit was the elimination of the direct payment of any part of the transportation cost, so that its entire payment became indirect.

Since the statute defines "for hire" as remuneration paid "either directly or indirectly," it can make little difference whether all of the transportation expense was paid directly, which the evidence does not show has ever been done by any customer of a defendant here; or whether it was all paid indirectly by the customers as part of a defendant's business expense; or whether it was paid by a combination of the direct and indirect methods. Obviously the transportation expense has to be paid somehow if the defendants are to stay in business,

and the only normal source of payment is the money received from customers.

Whether or not the cost of the transportation was paid directly, indirectly, or partly in one way and partly in the other, the question here is whether a business man, a farmer, or anyone else comes within the statute who operates a motor vehicle for the delivery of his own merchandise or produce purely as an incident to his regular business and does not compete for the transportation of the persons and property of others, with those engaged in the transportation business.

Thus the question is whether in enacting the statute the █ legislature meant merely to supervise and regulate those engaged in the business of transporting persons and property for hire, or also to supervise and regulate all those engaged in other businesses and using motor vehicles purely for the incidental purpose of delivering their own goods in the course of such businesses. The former would seem to be the clear intent, since the title of the Act expressed an intention to supervise, regulate and control "motor carriers *engaged in the transportation* by motor vehicles of persons and property for hire" etc. "To engage" is "to embark in a business." (Webster's New International Dictionary, Merriam-Webster, 2d ed.) The defendants are engaged in wholesaling just as ranchers are engaged in ranching. They are not ordinarily understood to be "engaged in" every occupation or activity purely incidental to their business. One engaged in either of those businesses and using motor vehicles for purposes incidental thereto cannot properly be said to be *engaged in the transportation* of goods, and the title of the Act cannot logically be said to have given notice to the public or legislature of an intent to regulate their use of the highways. The attempt to ignore the self-evident limits of the title and to construe the Act as contended for by plaintiffs here is met squarely by the provisions of section 23 of Article V of the state Constitution that "If any subject shall be embraced in any Act which shall not be expressed in the title, such Act shall be void * * * as to so much thereof as shall not be so expressed." The same result was declared

in *People* v. *Montgomery*, 92 Colo. 201, 19 Pac. (2d) 205, where it was expressly attempted to include persons carrying their own property but the title of the Act was limited to the use of motor vehicles "in the business of transporting persons and property" for hire.

If there were any possibility that by "engaged in transportation" the legislature meant "engaged in farming, wholesaling or other business or profession and transporting property in connection therewith," it is entirely dispelled by the provisions of the Act itself. Several things in the Act negative such intention, such as the reference to "business" and "service" in sections 3847.1 and 3847.11, and especially the requirement of a certificate of public convenience and necessity, the issuance of which plaintiffs may in their discretion grant or refuse. It is conceivable that the legislature might wish to regulate this incidental use of the streets and highways by business men, workmen and farmers, but it is not conceivable that it would attempt to do so by requiring them to obtain such certificate of convenience and necessity from the plaintiffs under provisions like those of section 3847.11. Certainly it would constitute bureaucracy run riot to permit an administrative board to put out of business a person using streets and highways as a necessary incident to his occupation, by deciding that the public convenience and necessity did not justify granting him such certificate. Without considering the constitutionality of such a measure, it is incredible to us that the legislature could have intended such a result, even if it were within the title of the Act. We must conclude, therefore, that the title of the Act expresses the exact meaning intended and that the legislative intent was merely to regulate those engaged in the business of transporting persons and property for hire.

Plaintiffs rely upon the statutory definitions in subdivision (i) of section 3847.1 that "the words 'for hire' mean for remuneration of any kind, paid or promised, either directly or indirectly," and in subdivision (h) of that section that "motor carrier" means every person or corporation operating motor vehicles on the highways "for the transportation of persons

and/or property for hire,'' etc. The argument is that the defendants do receive remuneration for the transportation ''directly or indirectly,'' and that they come within the above definition of carrier, since they operate trucks to transport property, even though they are not engaged in the motor carrier business and carry their own property only as an incident to the business in which they are engaged. Even if such an intent were expressed by the title of the Act, the contention could not be sustained.

It is well settled that a person who transports merely himself or his own property is not a carrier, and that by defining a carrier as one operating motor vehicles for the transportation of ''persons and/or property'' the legislature must have meant ''other persons and/or the property of others.'' A person may be compensated directly or indirectly for transporting his own property, as the defendants have been in this instance. He may also be compensated directly or indirectly for transporting his own person, as is the doctor or the carpenter, plumber or tinsmith who conveys himself by motor vehicle to perform work at the premises of others. Their charges must necessarily defray their transportation expense, directly or indirectly. In such case they might strictly be claimed to be motor carriers within the terms of the Act because they are operating motor vehicles for the transportation of their own persons; but no one would seriously make such contention, because it would not be reasonable. Certainly no one would criticize reading the word ''other'' into the definition in that connection, for no other meaning could have been intended, unless everyone who conveys himself to work by a motor vehicle is within the definition and must obtain a certificate of public convenience and necessity from the Board of Railroad Commissioners. But it is no less inevitable that the same concept be read into the other half of the expression ''persons and/or property.'' Certainly the doctor, carpenter, plumber or tinsmith, who could not logically be considered a carrier for transporting his own person, would not be brought within the definition because he carried his own instruments, tools and equipment;

nor can the farmer who carries his own produce to market, or the wholesaler, jobber or retail grocer, who delivers his own merchandise in the regular conduct of his business. It would do violence to reason to construe a definition of motor carrier so as to include one's own person or property.

A leading decision so holding is *Holmes* v. *Railroad Commission*, 197 Cal. 627, 242 Pac. 486, in which the court said: "One who transports merely his own freight over the highway is not a carrier, private or otherwise. He may be a farmer or manufacturer or a merchant or what not, but the business in which he is engaged is not the business of transportation. He is not a carrier unless he engages in the business of transportation of the persons or property of others for compensation. One who transports merely his own goods, is of necessity engaged in some business other than transportation, and the transportation of such goods is no more than an incident to such business. So, also, one, who transports the goods of another as a servant or agent of such other, is not engaged in the business of transportation, but in so doing is engaged in the business of his master or principal, whatever that business may be. But one, who engages as an independent calling in the transportation of goods for another or for others under contract and for compensation, is engaged in the business of transportation and is a carrier."

Other cases to the same general effect are *People* v. *Montgomery, supra, Murphy* v. *Standard Oil Co.*, 49 S. D. 197, 207 N. W. 92, *City of Sioux Falls* v. *Collins*, 43 S. D. 311, 178 N. W. 950, and *Roundtree* v. *State Corporation Commission*, 40 N. M. 152, 56 Pac. (2d) 1121; and while it may be said that the statutes of those states are not identical with ours, this court more than merely suggested a like construction of our own statute in *Christie Co.* v. *Hatch*, 95 Mont. 601, 28 Pac. (2d) 470, when it said: "Defendants and interveners are not motor carriers *engaged in the business* for hire, within the meaning of Chapter 184."

Appellants rely principally upon *Pure Oil Co.* v. *Cornish*, 174 Okl. 615, 52 Pac. (2d) 832, which seemed to hold that one was a carrier who transported his own property. However, a refer-

ence to the statute in question shows that it specifically defined a Class C carrier to include "all carriers which are operated by owners for the transportation of their own property," etc., which our Act does not attempt to do. The Oklahoma decision is therefore not in point.

It necessarily follows from what has been said that the defendants are not within the statute and cannot be denied the use of Montana streets and highways as an incident to the conduct of their lawful business, nor be required to apply to plaintiffs for a certificate of public convenience and necessity as a prerequisite to such use. The learned trial judge committed no error in denying the injunctions sought in these three consolidated actions, and his order is affirmed.

ASSOCIATE JUSTICES ERICKSON, ANDERSON and MORRIS concur.

MR. JUSTICE ANGSTMAN:

I dissent. I think the statute reaches operations here involved. As thus construed, the statute would not operate to put any person out of business, as suggested by my associates. If the Board of Railroad Commissioners would not issue a certificate of public convenience and necessity to those operating as the defendants do, then, instead of going out of business, they would simply be obliged to make use of the available carriers already in the field and holding a certificate. The suggestion that farmers, ranchers and others would be required to obtain a certificate is untenable since they merely make occasional trips which are exempted by the Act, subdivision (h), section 3847.1, Revised Codes. I see nothing in the suggestion that the title of the Act is misleading.

In disagreeing with my associates I am accepting as law the majority opinion in the case of *Barney* v. *Board of R. R. Commrs.*, 93 Mont. 115, 17 Pac. (2d) 82. By that opinion the law respecting the use of the highways for gain was upheld as reasonably calculated to guard against the abusive use of the roads and to promote the safety of the public. As the law is now construed by my associates, it is unjustly discriminatory

as I pointed out in my dissenting opinion in the *Barney Case*.. Ownership of the property carried for gain cannot be made the basis of different treatment of different carriers. (*Weaver* v. *Public Service Com.*, 40 Wyo. 462, 278 Pac. 542, 548.) As now construed, a person may engage in the regular business of carrying his own property for remuneration without being obliged to pay the fees which are exacted from one carrying the same property in the same manner and over the same highways when it belongs to another. The damage to the highways and the danger to the public are as great in the one case as in the other. To free the Act from being unjustly discriminatory it must be construed as requiring a license and the payment of the fees for carrying property belonging to the carrier as well as when it belongs to another, when done for remuneration as here.

Rehearing denied March 19, 1941.